Campbell, Chief Justice,
delivered the opinion of the court.
The matters involved herein were referred to this court by the Secretary of the Navy under the provisions of section 148 of the Judicial Code, the reference having been made upon the application of plaintiffs. Under the provisions of the contract involved in the case it is probable that all of the questions could have been decided by the Secretary. He appointed a board, which took a large amount of testimony and made an investigation required by his order, consuming more that a year’s time, and reported their recommendations. Without taking further action than to tender to the plaintiffs the difference between the amount found by the board to be the value of the work done, with the value of certain materials added, and the amount which had already been paid the plaintiffs, the entire controversy was referred to this court.
Thereafter the plaintiffs appeared and filed their petition in this court.
The rules of the Supereme Court provide that this court shall find the ultimate facts, and also provide that the parties may make requests for findings of fact deemed by them to be material for the due presentation of the case. The rules of this court, established to carry into effect the rules of the *397 Supreme Court, require a statement, in the form of distinct number propositions, of the facts which the party desires to have found, so arranged as to present a concise statement in orderly and logical sequence of the whole case as the party desires it to appear in the findings of fact, and that subjoined to each proposition so requested there shall be references to the pages of the record or to the unprinted evidence relied on in its support. The rule also requires that where a party objects to requested findings of fact by the other party the objection shall be pointed out specifically, with appropriate references to the record relied upon to support them. Either party is allowed to make requests for findings of fact. The rule does not contemplate or authorize in the requested findings of fact arguments or conclusions of fact or of law. We call attention to these rules because in the instant case they have not been ful-ly observed.
In 1899 the plaintiffs entered into a contract with the United States for the construction of certain sections of a sea wall near the Naval Academy and agreed to deliver the same complete in all respects as required by the drawings, plans, and specifications to the Superintendent of the Naval Academy, or to such person as he might direct to receive the same. A copy of the contract and specifications is attached to the petition. By the specifications, made a part of the contract, it was provided that the contractors should guarantee and maintain the stability of all work and material and keep same in perfect repair and condition for a period of one year after the issuance of the final certificate and would make good any defects appearing during that period when called upon to do so. The obligation of the plaintiffs therefore extended not only to the building of the sea wall but to its maintenance for the period stated, and having entered into that obligation, strict as it was, it became their duty to perform it.
It was said by the Supreme Court in Dermott v. Jones, 2 Wall., 1:
“ It is a well-settled rule of law that if a party by his contract charge himself with an obligation possible to be per *398 formed he must make it good, unless its performance is rendered impossible by the act of God, the law, or the other party. Unforseen difficulties, however great, will not excuse him.”
Under the rules laid down in that case the plaintiffs would have no standing in this court, because they did not perform their contract, were it not for the fact that their contract was annulled and the controversy subsequently transferred to this court.
During the time of the prosecution of the work under this contract the plaintiffs were also prosecuting other work at the Naval Academy under contracts involving much larger sums than was involved under this contract. The work under the several contracts was carried along simultaneously. The original contract with which we have to do was made in February, 1899, and provided for the completion of the work upon the sea wall in 270 days. Several extensions of time were granted at the request of the plaintiffs, and considerable delays,, shown in the findings, were occasioned by the agents of the defendants.
A large part of the contention of plaintiffs is devoted to an attack upon the architect and upon the plans and specifications, and, strangely enough, it is alleged in the petition that the plaintiffs performed all that was required by their contract. It must be presumed that the contractors, who were experienced in their line of work, understood something of the nature of the work they undertook to perform. It is too ■late, after a contract is made and its obligations have been assumed, to complain of features that should have been considered before the contractors agreed to do the work. Dermott v. Jones, supra. They not only charge incompetency upon the architect but also bad faith on the part of the officers having supervision of the work, and they in substance charge that fraud was perpetrated upon them in the matter of certain borings which were made prior to the time of the contract. These charges are not sustained. The said borings were made to ascertain the character of the soil into which the piles were to be driven, and were by what is called the wash-boring method. The charge that these borings *399 were improperly made is not sustained by the evidence. A correct record of the borings was kept, and it was accessible to all contractors when they made their bids. In addition thereto notations were made upon some of the plans calling attention to the location of the wall asnd the result of the borings. A prudent contractor was thus sufficiently put upon notice of the uncertainties of the soil into which piles were to be driven and the uncertainties of the foundation upon which they were to rest to sustain the sea wall. That difficulties were encountered which had not been anticipated by the contractors and which were unexpected by the Government’s agents, appears certain, and it also appears that the contractors were not left entirely free and at times were not left reasonably free to cope with the situation as it developed. On the contrary, the defendants’ superintendent in many instances took what may be characterized as a practical direction of the work. It was the right and duty of the contractors to build the sea wall according to their contract and without undue interference on the part of the Goverment’s agents.
As shown by the findings of fact, the wall sank in places and went somewhat out of alinement. The producing cause of these conditions is not definitely shown. If it was the duty of the contractors to prevent or remedy such conditions it was their right to be allowed to do so within the terms of their contract without undue interference or delays caused by the agents of the defendants.
The contractors were engaged on the work in September, 1902, more than three years after it had begun. On or about September 17, 1902, pursuant to direction by the Assistant Secretary of the Navy work was discontinued. In December thereafter a board was appointed by the Assistant Secretary of the Navy to examine into the status of the work and report thereon, as shown in Finding XVIII. That board reported in March, 1903, that the most feasible method of making the wall stable appeared to be by filling on the outside with sand, removing the mud from the inside of the wall, and replacing it with sand. They further reported that sand on the outside of the wall, as suggested, would *400 entirely fill the space alongside, and while it would accomplish the object of allowing the inside to be filled with sand and the mud to be pumped out, it would defeat the fundamental object of the structure as a place for vessels to lie’ alongside. In other words, the suggestion of the board, if carried out, would not have produced a sea wall such as the contract contemplated. Thereafter, from March, 1903, to November 25, 1903, no action was taken, but on the latter date the Assistant Secretary of the Navy addressed a communication to the contractors requesting them to proceed without further delay with the removal of the mud and the filling with sand, both inside and outside of the sea wall, in order to insure its stability. 'We think it is manifest that the defendants had no right to impose the condition indicated by that notice. They eeuld have insisted upon the plaintiffs complying with their contract unless the long-delays by the Government and the various interferences of its officers had furnished excuse for not doing so, but the defendants certainly had no right to require something done which would have defeated the very purpose of the sea wall and made it in effect no sea wall at all. We think the plaintiffs had a right to refuse to do that work, and that the defendants had no right to annul the contract upon such refusal.
The evidence satisfies the court that the plaintiffs, if allowed to proceed, would not have made any profit upon their contract. They are entitled to be paid for the value of the work to defendants, which they did, less what has been paid them, and to be paid the value of certain material which was taken over by the defendants at the time of the alleged annulment of the contract. It does not appear that the defendants did any further work upon the wall or expended any other sums on account thereof. There are, however, some items claimed herein for which the plaintiffs are entitled to recover.
1. The specifications call for certain kinds of wood to be used in the piling. The plaintiffs bought some Virginia and Maryland pine piles, and a controversy arose as to whether they could be used in the work they had undertaken. A *401 large part of this work under some of the contracts was upon the land, and, after some correspondence, the architect authorized the use of Mainland pine for piles on the land work, but ruled that in the sea wall they must use Georgia yellow-pine piles. The question then arose as to whether the plaintiffs could use Georgia short-leaf yellow pine, but the clerk of the works required them to use Georgia long-leaf yellow pine. As shown in the findings of fact, the latter variety is much more expensive, and during the progress of the work some Maryland and Virginia pine piles were allowed in the work on the sea wall. The question therefore is whether the contractors should be compensated for the additional expense to which they were necessarily subjected in having to procure Georgia long-leaf yellow-pine piles. The specification does not distinguish between the long-leaf and the short-leaf yellow pine, but it does show that piles of other kinds of wood were within its terms, and the short-leaf yellow pine was as good as these other varieties of wood. It appears that the trade understood that Georgia yellow-pine piles referred to the short-leaf variety.
In a supplemental contract made with the contractors relative to a change in the sea wall it is provided that certain grillage should be constructed of Georgia long-leaf yellow-pine lumber. We thus have the contract of the parties speaking in one instance of Georgia yellow-pine piles and in another instance it specifically refers to Georgia long-leaf yellow pine. We see no good reason for imposing upon the contractor a duty of getting the more expensive variety of yellow-pine piles, which were superior to other grades of wood mentioned in the specification, especially when he was allowed later to use a different kind of pine piles in the same character of work, and when the distinction between the two grades of yellow pine is made in the contract of the parties. We are of opinion that the contractors should be paid the difference between what they could have furnished Georgia yellow-pine piles for and what they reasonably expended for the long-leaf Georgia yellow-pine piles. That difference is shown in Finding VIII.
*402 2. By agreement between the parties, a change in the method of construction of the concrete sea wall was made. This change was suggested by the contractors, who proposed to substitute what was called the open-caisson method of construction. By that method a bos form, partly filled with concrete, would be floated out to the pile foundation and there sunk, and then filled with concrete. A short space would thus be left between the bos forms which had to be later filled. When the contractors came to filling that connection the superintendent of the academy, acting through the clerk of the works, required them, over their protest, to change the concrete misture so as largely to increase the amount of cement called for by the specification. The superintendent’s objection was based upon the idea that dropping the mixture through the water would eliminate a large part of the cement and make a weaker mixture. The contractors then offered to deposit the concrete through a funnel, and it could have been satisfactorily laid in place by that method. They, however, finalty placed it by hand through divers, a method of their own selection! They could have used the funnel method. We think they should not have been required to use the additional cement and that they should be paid for it. Having selected a more expensive way to place it than they were called upon to do, we think they should not recover that expense. The additional cost of the cement is shown in Finding XII.
8. In the early part of 1901 it was discovered that the sea wall near the northwest side of the power-house pier had settled several inches and had moved outward. The superintendent of the academy called upon the contractors to take such steps as would put the wall in satisfactory condition, and notified them that unless such action were taken immediately he would recommend that their contract be forfeited. The contractors, after considerable correspondence, stated to the superintendent that whether the responsibility for the condition of the sea wall was theirs or not, and wholly from a desire to successfully complete their contract, they were willing, in order to prevent further settlement, to drive a row of piles on the outer edge of the wall to the best bearing *403 obtainable, but that they would not thereby waive their right for extra compensation for such work. They thereupon drove a number of piles on the outer edge of the wall, and as the reinforcement of the wall was done under water by divers, the reasonable cost to the contractors was $6,838.59. This work was done upon the demand of the Superintendent of the Naval Academy, who, in a written communication, notified plaintiffs that unless the suggested action was taken immediately he would recommend that their contract be forfeited. The method of doing the work was likewise suggested by the defendants’ agent. The contractors claimed that it would be extra work and rendered bills daily under the provision of the contract calling for such bills in case the value of the work had not been agreed upon. Charged as they were by their contract with the duty of completing the wall, it was not a right of the superintendent to dictate what additional work should be done. In other words, the conractors should have been left free to carry out their own contract. If they chose to experiment, it was at their own risk, but the defendants’ superintendent could not impose an experiment, and, having done so, we think the defendants should pay for the additional work.
4. Thereafter, the contractors, in addition to said piling work, were directed by the defendants’ representatives to load the wall with granite, with a view to ascertaining what settlement would occur under all weight intended to be carried. The material and labor involved in this work is shown in Finding XIII. As it was manifestly an experiment on the part of the defendants we think the contractors should be paid for what it reasonably cost them to do the Work.
5. The settlement and movement of the parts of the wall continued, and, on or about July, 1902, the superintendent of the Naval Academy, under the direction of the Secretary of the Navy, directed the contractors to place a large amount of sand on the outside of said wall, and they accordingly dumped there something over 84,000 cubic yards of sand, for which they were not paid anything. The purpose of this sand was to add to the stability of the wall and the *404 work was done under the direction of the Secretary of the Navy, the contractors protesting that they should be compensated for it. No part of this work was contemplated by the contract between the parties, and we think the contractors should be paid for that extra work, the amount of which is shown in Finding XIII.
6. After the piles were driven and cut off, it was found that there was a greater variation than 1 inch between the highest and lowest pile heads. No pile head as cut was more than 1 inch above or below the datum line shown on the drawings. The contractors were required to recut the piles to within a variation of 1 inch of the highcr l and lowest pile heads, and this work had to be done under water and by a diver, the expense of which is shown in Finding XIV. The specification required that the heads of the piles should be cut off horizontal at the levels shown on the drawings and plans, with no greater variation than 1 inch. We think the reasonable construction of the specification was that the variation should be with reference to the datum line and not with reference to the piles in the different parts of the work, and for this work of cutting the contractors should be compensated. The expense of this is shown in Finding XIV.
7. As above stated, the work was long delayed in its prosecution and was never completed. Several extensions of time were given at the request of the contractors, but the defendant took much time, and unreasonable time, in making investigations and delayed the contractors for different periods, in the meantime stopping the work, leaving portions of the plaintiffs’ plant and some of their employees idle, and thereby entailing an expense upon the contractors as shown in Finding XVII. For this expense the contractors should be compensated.
Judgment will accordingly be granted under Findings VIII, XII, XIII, XIV, XVII, and XVIII in the sum of $36,877.10. And it is so ordered.
Hat, Judge; Downey, Judge; Barney, Judge; and Boom, Judge, concur.